STATE OF CONNECTICUT *v.* THOMAS STOVALL
(AC 34001)

Beach, Robinson and Bishop, Js.

Argued February 4—officially released May 14, 2013

*John W. Cerreta*, with whom, on the brief, was *Michael P. Shea*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Richard L. Palombo, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Thomas Stovall, appeals from the judgment of conviction, rendered after a jury trial, of one count of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b) and one count of possession of narcotics with intent to sell within 1500 feet of a public housing project in violation of General Statutes § 21a-278a (b).[1] On appeal, the defendant claims that (1) there was insufficient evidence to support the jury's verdict that he had constructive possession of the crack cocaine found in the hallway closet in a third party's apartment, (2) there was insufficient evidence to support the jury's verdict that he intended to sell within 1500 feet of a public housing project, (3) the trial court improperly instructed the jury with regard to the element of intent to sell within 1500 feet of a public housing project and (4) the admission of the reviewing state analyst's certification on the controlled substance report was a violation of his constitutional right to confrontation. We reverse, in part, and affirm, in part, the judgment of the trial court.

---

[1] The defendant was also convicted of two counts of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). He does not challenge that conviction on appeal.

The jury reasonably could have found the following facts. On January 16, 2010, at approximately midnight, a raid team from the Bridgeport police department executed a search warrant for apartment 449 in building four of the Charles F. Greene Homes housing complex (Greene Homes), a federally funded housing project. In executing the warrant, the officers knocked on the door and waited for a response. When they did not receive one, they opened the door, which was unlocked, and entered the apartment. Upon entry, the officers detained and secured five people—Librea Patrick, the tenant of the apartment, Latavia Goss, Roderick Williams, Shawndell Gaynard and the defendant. Patrick's two small children were allowed to remain sleeping. All of the adults were searched. The search of the defendant revealed $1125 in mixed denominations. After searching all of the adults, Patrick remained in the apartment and the other suspects were transported to the police station. The police then began to search the apartment.

The search of the apartment revealed a department of social services card and incident report belonging to the defendant in one of the bedrooms, sixteen cellular phones found throughout the apartment, an empty scale box, two razor blades with a residue that was later determined to be cocaine and small ziplock bags in the kitchen. A search of the hallway closet across from the kitchen revealed a shoe box that contained a loaded .38 caliber revolver, a loaded .32 caliber revolver, a Remington bullet box with two live bullets inside, and several letters that referenced "Tom-Tom," "Thomas" and "Tomster." The contents of the shoe box were collected as evidence, but the shoe box itself was not. An officer also searched the clothing in the closet. In a heavy, men's winter jacket, he found thirteen orange-tinged plastic ziplock bags, each containing a white, rock-like substance that was later determined to be crack cocaine. The jacket was not collected as evidence.

In a substitute long form information, the defendant was charged with possession of narcotics with intent to sell by a person who is not drug-dependent, possession of narcotics with intent to sell within 1500 feet of a public housing project and two counts of criminal possession of a firearm. On the basis of the evidence presented at trial, the jury found the defendant guilty on all counts. The court sentenced the defendant to ten years of incarceration on the first count and three years of incarceration on the second count.[2] This appeal followed.

I

On appeal, the defendant first argues that there was insufficient evidence to convict him of the drug possession charges. He claims that the conviction on both charges must be reversed because the state failed to present evidence to support an inference that he both knew of the existence of and exercised dominion or control over the crack cocaine that was found in the pocket of a men's winter coat that was located in Patrick's hall closet. The defendant additionally maintains that the conviction of possession of narcotics with intent to sell within 1500 feet of a public housing project cannot be sustained because the state failed to present evidence to support an inference that he actually intended to sell at Greene Homes. We disagree with both contentions.

We begin with the standard of review and relevant legal principles. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the

---

[2] The court also sentenced the defendant to two years of incarceration for each of the two counts of criminal possession of a firearm and ordered that the sentences run consecutively for a total effective sentence of seventeen years.

facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 146–47, 869 A.2d 192 (2005). "While the jury may not speculate to reach a conclusion of guilt, [it] may draw reasonable, logical inferences

from the facts proven to reach a verdict. . . . Deference is given to the trier of fact who had the opportunity to observe the conduct, demeanor and attitude of the trial witnesses and to assess their credibility." (Internal quotation marks omitted.) *State* v. *Riser*, 70 Conn. App. 543, 551, 800 A.2d 564 (2002).

"[An] appellate court's first task, in responding to a claim of evidentiary insufficiency, is to apply the traditional scope of review to the evidence. That requires that . . . we view all of the evidence, and the reasonable inferences drawable therefrom, in favor of the [trier's] verdict. . . . We note that a claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 77, 993 A.2d 970 (2010).

A

We first address the defendant's claim that the state did not prove beyond a reasonable doubt that he had constructive possession of the drugs found in the jacket. He contends that because the jury reasonably could not have concluded that the jacket where the crack cocaine was found belonged to him, it also could not have inferred that he knew about and exercised dominion or control over the drugs. We are not persuaded.

In order to establish that the defendant was guilty of the possessory narcotics offenses with which he was charged, the state was required to prove beyond a reasonable doubt that he had actual or constructive possession of the narcotics. *State* v. *Hernandez*, 254 Conn. 659, 669, 759 A.2d 79 (2000). "To prove either actual or constructive possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence, and exercised dominion and control over it."

(Internal quotation marks omitted.) *State* v. *Butler*, supra, 296 Conn. 78. "Where . . . the [controlled substances were] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact." (Internal quotation marks omitted.) *State* v. *Martin*, 285 Conn. 135, 149, 939 A.2d 524, cert. denied, 555 U.S. 859, 129 S. Ct. 133, 172 L. Ed. 2d 101 (2008).

"Under the doctrine of nonexclusive possession, [w]here the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Butler*, supra, 296 Conn. 78. "While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the jury [is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." *State* v. *Padua*, 73 Conn. App. 386, 419, 808 A.2d 361 (2002), rev'd in part on other grounds, 273 Conn. 138, 869 A.2d 192 (2005).

"To mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses . . . it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband." (Internal quotation marks omitted.) *State* v. *Leon-Zazueta*, 80 Conn. App. 678, 683, 836 A.2d 1273 (2003), cert. denied, 268 Conn. 901, 845 A.2d 405 (2004).

Officer Robert Simpson testified that he searched the hallway closet. When he opened the closet door, he saw that it was packed full of clothes, boxes and bags.

Simpson testified that there was one shelf on top and some clothes that were hanging. There were also bags on the floor of the closet. Simpson began his search by checking the pockets of clothing that were hanging up. When he checked the pockets of an adult men's jacket that was hanging up in the closet, he found orange-tinged ziplock bags that contained crack cocaine. Simpson described the jacket as a big, thick, heavy winter coat, but could not remember the color of the jacket, whether the jacket had any markings on it or whether there were any initials inside the jacket. He did not look at the tag inside the jacket and did not know the size of the jacket. Additionally, Simpson testified that he did not take the jacket as evidence.

The sole witness who testified about the ownership of the contents of the items in the hallway closet was Patrick. She testified that she allowed the defendant to keep a box of sneakers in her hallway closet. Patrick also testified that the defendant was allowed to keep coats there, but upon further questioning, did not know if the defendant kept more than one coat in the closet and could specifically remember only one coat, which she described as a "red, black and white jacket that was hung up on my ironing board stand that was in the closet on the door. She also remarked that the jacket was "an expensive Coogi jacket" that was "more of a blazer." Patrick stated that the Coogi jacket was the only jacket that was hanging in the closet and that she knew it was the defendant's because he was the only one who would wear it. Patrick also testified that she did not know from which jacket the drugs were taken and that she did not know how many jackets were in the closet, but knew that two male friends who were involved in criminal activity kept jackets in the closet that were either folded or thrown on the ground.

On the basis of this evidence, the jury reasonably could have inferred that the jacket that Simpson

searched belonged to the defendant. The defendant was present at the apartment when the police executed the search warrant. Simpson testified that he searched a jacket that was hanging in the closet and found crack cocaine. Patrick testified that the defendant owned the jacket hanging in the closet and that no other jackets were hanging up in the closet. Thus, the jury reasonably could have concluded that the hanging jacket that Simpson searched was the same jacket as the one described by Patrick as hanging in the closet and being owned by the defendant. Coming to that conclusion, the jury reasonably could have inferred that the defendant both knew about and exercised dominion and control over the crack cocaine that was found in the jacket.

To be certain, there were discrepancies between Simpson's and Patrick's testimony, such as whether clothing was hanging in the closet, whether the hanging jacket described by both Simpson and Patrick was on a hanger or on the closet door on an ironing board stand and the description of the hanging jacket. These inconsistencies required the jury to resolve whether the jacket described by Simpson was the same jacket described by Patrick. "It is axiomatic [however] that it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Osbourne,* 138 Conn. App. 518, 533–34, 53 A.3d 284, cert. denied, 307 Conn. 937, 56 A.3d 716 (2012). It is equally axiomatic that "we construe the evidence in the light most favorable to sustaining the verdict . . . ." *State* v. *Padua,* supra, 273 Conn. 158. Both witnesses testified about only one jacket hanging in the closet, and Patrick testified that the only hanging jacket

belonged to the defendant. The jury was free to credit Simpson's testimony over Patrick's with respect to where the jacket was hanging and what the jacket looked like.

Moreover, Patrick's testimony that two other male friends who were involved in criminal activity had jackets in the closet besides the defendant does not defeat the reasonable inference that the jacket in the closet where the drugs were found belonged to the defendant because that testimony established that those other jackets were not hanging up, but rather were folded or thrown on the floor of the closet. Accordingly, when the evidence and reasonable inferences drawn therefrom are viewed in the light most favorable to sustaining the verdict, the jury reasonably could have inferred that the defendant owned the jacket where the drugs were found and, therefore, knew of, and exercised dominion and control over, the drugs found in the jacket.

B

We next address the defendant's claim that the state did not prove intent to sell within 1500 feet of a public housing project. The defendant argues that although the jury reasonably could have inferred that he intended to sell drugs somewhere, there was not sufficient evidence to prove beyond a reasonable doubt that he intended to sell drugs at Greene Homes. We disagree.

The following additional facts are necessary to our resolution of this claim. Patrick testified that she and the defendant became friends in 2005 and that she knew him as "Tom Tom." She also testified that the defendant would come to her apartment two to three times a week and that Patrick would see him around Greene Homes two to three times per week. When at Patrick's apartment, the defendant would visit her and her friend, Goss. Additionally, Patrick testified, Greene Homes is known as an area where narcotics can be purchased,

and she had never seen the defendant sell drugs in her apartment or in the area of Greene Homes.

William Reilly, a detective with the Bridgeport police department who participated in the execution of the warrant, also testified. He testified that Greene Homes is a high crime and drug trafficking area. Reilly further testified that on the night of the raid, he was the evidence officer who gathered and documented any evidence that was recovered. During direct examination, Reilly identified the sixteen cell phones recovered from the apartment, the small empty ziplock bags and two razor blades with narcotics residue and the thirteen orange-tinted ziplock bags that contained crack cocaine. Based on his training and experience, Reilly stated that the empty ziplock bags were consistent with the type generally used to package crack cocaine, that the razors were used to cut up narcotics into smaller pieces so as to fit in the small ziplock bags and that the substance in the thirteen orange-tinted bags was crack cocaine. Reilly testified that based on the way the drugs were packaged, individually, the crack cocaine was packaged to be resold and that the street value of one bag was $10. Furthermore, the absence of a crack pipe or another device to ingest crack cocaine suggested that the drugs were being sold out of the house.

"[Section] 21a-278a (b) prohibits any person from transporting with the intent to sell or dispense, [or] possessing with the intent to sell or dispense . . . any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising . . . a public housing project . . . . [Section] 21a-278a (b) further provides that, [t]o constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising . . . a public housing

project . . . . This court has held that the plain language of § 21a-278a (b) requires as an element of the offense an intent to sell or dispense the narcotics at a location that is within 1500 feet of a public housing project, among other geographical designations. . . . There is no requirement that the state prove that the defendant had actual knowledge that the location where he intended to sell drugs was within the proscribed area . . . rather, the state must demonstrate only that the defendant intended to sell or dispense those drugs in his or her possession at a specific location, which location happens to be within 1500 feet of a public housing project, among other geographical designations." (Citations omitted; internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 658, 1 A.3d 1051 (2010).

On the basis of the evidence, the jury reasonably could have inferred that the defendant intended to sell the crack cocaine found in the jacket within 1500 feet of a public housing project. As we have already concluded, the jury reasonably could have found that the defendant possessed the crack cocaine found in the jacket in the closet. Based on Reilly's testimony, the jury reasonably could have inferred that the defendant intended to sell the crack cocaine found in the jacket and that he intended to sell the crack cocaine from Patrick's apartment. Even though Patrick testified that the defendant had never sold drugs from her apartment, a fact that could be construed as being in tension with Reilly's testimony, it is the jury's role to weigh the conflicting testimony and determine what weight to lend to a witness' testimony. See *State* v. *Osbourne*, supra, 138 Conn. App. 533–34. The jury simply chose to credit Reilly's testimony over Patrick's. When the evidence and reasonable inferences drawn therefrom are viewed in the light most favorable to sustaining the verdict, the jury reasonably could have inferred that the defendant

intended to sell the crack cocaine within 1500 feet of a public housing project.

## II

The defendant next claims that the court improperly instructed the jury with regard to the element of intent to sell within 1500 feet of a public housing project. The state agrees that the court committed reversible error and that the defendant is entitled to a new trial on that offense. We agree with the parties.

The following additional facts are necessary for the resolution of this claim. On April 20, 2010, prior to closing argument, the court indicated that a charging conference had occurred and asked the parties if they had any further objections to the draft charge provided by the court. Defense counsel stated that he had an exception with respect to the portion of the charge on sale within 1500 feet of a public housing project. Recognizing that he had submitted the language contained in the court's draft jury charge,[3] based on his reading of *State* v. *Webster*, 127 Conn. App. 264, 13 A.3d 696 (2011), rev'd on other grounds, 308 Conn. 43, 60 A.3d 259 (2013), defense counsel orally requested that the jury be instructed that the state also would need

[3] The defendant's proposed jury instruction provides in relevant part: "The defendant is charged in count two with the illegal distribution of a controlled substance near a public housing project. The statute defining this offense imposes punishment on any person who possesses with the intent to sell to another person any controlled substance in or on, or within one thousand five hundred feet of the real property comprising a public housing project.

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt . . .

"Element 2—Within 1500 feet

"The second element is that the defendant possessed with the intent to sell the freebase cocaine in or on, or within 1500 feet of the real property of a public housing project. . . .

"In summary, the state must prove beyond a reasonable doubt that [1] the defendant possessed with the intent to sell freebase cocaine, and [2] that this occurred in or on, or within 1500 feet of the real property of a public housing project."

to "prove that the intended sales must occur within 1500 feet of a public housing project . . . ." The court indicated that *Webster* involved the sale of a narcotics rather than possession with intent to sell narcotics within 1500 feet, and, therefore, that it was inapplicable to the case.

The court subsequently read the charge as follows: "Now, the second count, illegal distribution near public housing. [The] [d]efendant is charged in count two with the illegal distribution of a controlled substance near a public housing project. The statute defining this offense imposes punishment on any person who possesses with the intent to sell to another person any controlled substance in or on or within 1500 feet of the real property comprising a public housing project. For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. . . . [The] [s]econd element is that the defendant possessed with the intent to sell the freebase cocaine[4] in or on or within 1500 feet of the real property of a public housing project. . . . In conclusion, the state must prove beyond a reasonable doubt that the defendant possessed with the intent to sell freebase cocaine and that this occurred in or on or within 1500 feet of the real property of a public housing project."

"It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those

---

[4] Crack cocaine is also referred to as freebase cocaine.

crimes are." (Citations omitted; internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 483–84, 668 A.2d 682 (1995).

"Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n [impropriety] in instructions in a criminal case is reversible . . . when it is shown that it is reasonably possible for [improprieties] of constitutional dimension . . . that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Devalda*, 306 Conn. 494, 505–506, 50 A.3d 882 (2012).

Our Supreme Court has interpreted § 21-278a (b) and held that the state must produce "evidence that the defendant engaged in conduct reflecting an intent to sell drugs *at some location within the proscribed area* . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 771, 36 A.3d 670 (2012); see also *State* v. *Denby*, supra, 235 Conn. 483. "[M]ere possession of narcotics with an intent to sell at some unspecified point in the future, at some unspecified place, is not enough [to prove a violation of § 21a-278a (b)]." (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 770. Thus, in order to comport with our precedent, the trial court must inform the jury

that the defendant intended to sell the narcotics in his possession within 1500 feet of a public housing project.

Both parties agree that the instruction given to the jury was ambiguous. In its charge, the court stated that "the state must prove beyond a reasonable doubt that the defendant possessed with the intent to sell freebase cocaine and that this occurred in or on or within 1500 feet of the real property of a public housing project." Because of the structure of the sentence, we cannot discern to what "this" refers. Thus, the jury was faced with two plausible interpretations of the necessary elements. A jury could reasonably interpret the charge to mean that the state needs to prove mere possession of narcotics within 1500 feet of a public housing project, regardless of where the defendant intended to sell the narcotics. Another reasonable interpretation, and the correct one, is that the state needs to prove that not only the possession but also the intended sales were within 1500 feet of a public housing project. Because both interpretations are reasonable, but only one is correct in law, the instruction as given was ambiguous. It is reasonably possible that the jury was misled as to what the essential elements of the crime were. Accordingly, we find that the court improperly instructed the jury with respect to the charge of possession of narcotics with intent to sell within 1500 feet of a public housing project.

### III

Finally, the defendant claims that his conviction of the narcotics charges should be reversed because the testimonial certification by the reviewing state analyst on the controlled substance report was a violation of his constitutional right to confrontation. Because he did not object to the admittance of the report at trial, the defendant seeks review of this claim under *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

The state, in reply, contends that (1) the defendant waived his right to appeal, (2) the record is inadequate for review, (3) it is not clear that a constitutional violation existed or deprived the defendant of a fair trial and (4) the admission of the reviewing analyst's signature on the toxicology report was harmless beyond a reasonable doubt. Assuming, without deciding, that the defendant's claim is reviewable pursuant to *Golding*, the defendant cannot prevail because any claimed error was harmless beyond a reasonable doubt. See *State* v. *William L.*, 126 Conn. App. 472, 480, 11 A.3d 1132, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011).

The following additional facts are necessary for our resolution of this claim. Laura Grestini, a chemist for the department of public safety, division of scientific services controlled substance toxicology laboratory, testified about the analysis that she performed on the evidence that was collected at Patrick's apartment. During her testimony, the state introduced a redacted copy of the report that Grestini had prepared for the case. When Grestini was identifying the document, she testified that the signature next to hers was the reviewing analyst's signature and that the reviewing analyst would "go through all the work and make sure that our conclusions agree with one another, basically." Defense counsel briefly conducted a voir dire of Grestini. After noting that the certification did not include language regarding whether Grestini had conducted and performed the examinations or evaluated the data,[5] defense counsel asked her if she performed the examinations, evaluated the data and had a specific recollection of this case. Grestini answered in the affirmative to all of the questions, and the report was entered into evidence as a full

[5] The certification provides: "I hereby certify that this is a true copy of the laboratory examination described herein and a true copy of the records of the Laboratory Division of the Connecticut Department of Public Safety pertaining thereto."

exhibit, with no objection from the defendant. Grestini then identified the reviewing analyst's signature as Jane Ridley and noted that the reviewer, in this case Ridley, would change a milestone in the computer to say that the report was technically reviewed, and print the report and sign it before giving it to Grestini to sign.

Defense counsel subsequently cross-examined Grestini about her testing methods, the results of the tests, her schooling and training, and the procedure for processing evidence after testing, but did not question her specifically about Ridley's signature or the extent of her knowledge of Ridley's review of Grestini's work. He did, however, elicit from Grestini that she would print the output from the machines so that when the reviewing analyst did her technical review of the case, she could see why Grestini reached the conclusion that she did. Defense counsel's only remark during closing argument about Grestini's testimony was that he did not "really have much to say about her because it's really not the point of what I'm telling you."

"[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding*, supra, 213 Conn. 239–40.

"The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. This right is secured for defendants in state criminal proceedings." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 816, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). "It is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . and only if the error was not harmless may the defendant prevail on his *Golding* claim. . . . The state bears the burden of proving that the error is harmless beyond a reasonable doubt." (Citations omitted.) *State* v. *Smith*, 289 Conn. 598, 628, 960 A.2d 993 (2008). "[T]he test for determining whether a constitutional [impropriety] is harmless . . . is whether it appears beyond a reasonable doubt that the [impropriety] complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.) *State* v. *Devalda*, supra, 306 Conn. 506.

"It is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, 238 Conn. 183, 211, 680 A.2d 1243 (1996). Thus, when evidence contained in a report is merely cumulative, its admission as a full exhibit is harmless. Id.

In the present case, the analyst who performed the tests and generated the report testified at trial. On direct examination, Grestini explained in detail how the evidence was processed, what tests were performed, how the tests were performed, the methods used to ensure accuracy, what machines were used and how the machines work. She also testified as to her findings about the evidence. On cross-examination, Grestini described the output that is generated from the

machines that allow her to make her conclusions as well as what daily tests are performed on the machines to ensure that they are in working order.

In addition to Grestini's testimony, the state also offered into evidence as a full exhibit a copy of her final report, prepared for this case, which identified the evidence submitted, the examinations and methods performed, and the results. The information in the report was the same information that was elicited during Grestini's testimony. Moreover, the defendant did not challenge Grestini's conclusions regarding the results of her analysis, nor did he address her testimony during closing arguments. Because the report was merely cumulative of Grestini's testimony, we conclude that the state has met its burden of proving beyond a reasonable doubt that the admission of the report, even if improper, was harmless.

The judgment is reversed only as to the conviction of possession of narcotics with intent to sell within 1500 feet of a public housing project and the case is remanded for a new trial on that count. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.