******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. I disagree with the majority's conclusion that there was insufficient evidence to support the jury's verdict that the defendant, Thomas Stovall, intended to sell narcotics within 1500 feet of a public housing project in violation of General Statutes § 21a-278a (b). I believe that the Appellate Court properly concluded that there was sufficient evidence to support the jury's verdict. See *State* v. *Stovall*, 142 Conn. App. 562, 574–75, 64 A.3d 819 (2013). Accordingly, I respectfully dissent.

"[Section] 21a-278a (b) prohibits any person from transporting with the intent to sell or dispense, [or] possessing with the intent to sell or dispense . . . any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising . . . a public housing project . . . . [Section] 21a-278a (b) further provides that, [t]o constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising . . . a public housing project . . . . This court has held that the plain language of § 21a-278a (b) requires . . . [that, in order to prove the intent element of the statute] the state must demonstrate only that the defendant intended to sell or dispense those drugs in his or her possession *at a specific location*, which location happens to be within 1500 feet of a public housing project, among other geographical designations." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 658, 1 A.3d 1051 (2010).

The only issue in this appeal is whether the state presented sufficient evidence that the defendant intended to sell the narcotics that were in his possession at a specific, proscribed location. I begin with the appropriate standards that guide the court's review. In evaluating a challenge to the sufficiency of the evidence, "[f]irst, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond reasonable doubt." (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 767, 36 A.3d 670 (2012). Moreover, "[o]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) Id., 768. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 756, 51 A.3d 988 (2012). Because the issue in the present case specifically concerns whether the state produced sufficient evidence of the defendant's intent, I also emphasize that "direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 770.

The Appellate Court properly concluded that there was sufficient evidence to support the jury's conclusion that the state proved beyond a reasonable doubt that the defendant intended to sell the crack cocaine that was in his possession within 1500 feet of a public housing project. *State* v. *Stovall*, supra, 142 Conn. App. 574. The evidence, in fact, supported the conclusion that the defendant possessed crack cocaine with the intent to sell *within* the public housing project. The evidence clearly established that the defendant was using Librea Patrick's apartment as his base for selling narcotics in the Charles F. Greene Homes apartment complex, a public housing project (project) in Bridgeport. Patrick's apartment was located within the project, and the defendant paid her between $20 and $30 per month. In exchange, Patrick allowed him storage space in a closet in the apartment. Patrick further testified that in the three weeks preceding the police raid team's January 16, 2010 execution of the search warrant on her apartment, the defendant had visited the apartment approximately two to three times per week. Most significantly, Patrick also testified that, during the same time period, roughly coinciding with his visits to her apartment, she observed the defendant outside on the project grounds.

The jury properly considered that information in the context of what the police discovered when they searched Patrick's apartment and the defendant's person. It is significant that the search occurred at approximately midnight. *State* v. *Stovall*, supra, 142 Conn. App. 565. The defendant had $1125 in mixed denominations on his person. As detailed by the Appellate Court, "[t]he search of the apartment revealed a [D]epartment of [S]ocial [S]ervices card and incident report belonging to the defendant in one of the bedrooms, sixteen cellular phones found throughout the apartment, an empty scale box, two razor blades with a residue that was later determined to be cocaine and small ziplock bags in the kitchen. A search of the hallway closet across from the kitchen revealed a shoe box that contained a loaded .38 caliber revolver, a loaded .32 caliber revolver, a Remington bullet box with two live bullets inside, and several letters that referenced 'Tom-Tom,' 'Thomas' and 'Tomster.' The contents of the shoe box were collected

as evidence, but the shoe box itself was not. An officer also searched the clothing in the closet. In a heavy, men's winter jacket, he found thirteen orange-tinged plastic ziplock bags, each containing a white, rock-like substance that was later determined to be crack cocaine." Id.

Detective William Reilly of the Bridgeport Police Department, the evidence officer for the search, testified that, on the basis of his training and experience as a police officer, the project was a "high crime drug trafficking area" where the police had made "hundreds of arrests for narcotics in the past." He further testified that the manner in which the crack cocaine was packaged—individually in ziplock plastic bags in the specific amount he observed each bag to contain—suggested that they were packaged to be resold, and that the street value for the contents of each bag was approximately $10. He also testified that the absence of a crack pipe in the apartment supported the conclusion that "drugs were being sold out of the house and not smoked."

The majority places undue emphasis on the lack of evidence of an actual or attempted sale within 1500 feet of the project. It is true that we have stated that "evidence of an actual or attempted sale is *sufficient* to prove beyond a reasonable doubt that a defendant intended to sell narcotics at a particular location." (Emphasis added.) *State* v. *Lewis*, supra, 303 Conn. 770. We have never, however, suggested that such evidence is necessary in order for the state to prove intent to sell narcotics at a particular location. On the contrary, we have recognized that even though it is more challenging for the state to satisfy its burden of proof "[w]ithout evidence of an actual or attempted sale," it is not impossible. Id., 771.

The contrast between the present case and two cases in which we concluded that possession of narcotics within the proscribed area, without evidence of an actual or attempted sale, was insufficient to establish intent to sell narcotics within the area, illustrates why the state sustained its burden of proof in the present case. Specifically, in both *State* v. *Lewis*, supra, 303 Conn. 777, and *State* v. *Hedge*, supra, 297 Conn. 621, this court concluded that there was insufficient evidence to establish a defendant's intent to sell narcotics within a proscribed zone.[1]

Both of those decisions, however, rested on the fact that the state had failed to prove that the defendant's presence at the particular location where he was arrested or searched was more than "merely fortuitous." *State* v. *Lewis*, supra, 303 Conn. 772. In *Lewis*, the police officers stopped the defendant because he matched the description of a robbery suspect, not because they believed he was selling narcotics. Id. In addition, the defendant was on a bicycle when he was arrested, and there was "no indication in the record

that the defendant was in the area for an amount of time sufficient to imply that he was doing more than passing through when the police detained him." Id., 773. Finally, we observed that because the defendant was stopped one block from where he lived, he necessarily had to pass through that area in order to leave and return to his home. His presence in that location, therefore, had not been proven to be more than mere coincidence. Id.

Similarly, in *State* v. *Hedge*, supra, 297 Conn. 660, the arresting officer stopped the defendant's vehicle for a reason unrelated to the sale of a controlled substance in the proscribed area. The officer stopped him merely because he had failed to use a turn signal. Id. Additionally, we observed, "[t]he state adduced no evidence that the defendant was on his way to [the public housing project], recently had been at [the public housing project], or otherwise had engaged in any activity, suspicious or otherwise, that would give rise to a reasonable inference that he planned to sell drugs at or within 1500 feet of [the public housing project]." Id.

Other than suggesting that our decisions in *Lewis* and *Hedge* rested on the broad principle that evidence of "general willingness" to sell drugs at the proscribed location if customers should have presented themselves is insufficient to establish possession with an intent to sell at a particular location, the majority does not explain why it believes that the present case is not distinguishable from those cases. Instead, the majority focuses its discussion primarily on Appellate Court decisions. Although I maintain that our decisions, rather than those of the Appellate Court, properly should control, I briefly address the majority's reliance on *State* v. *Kalphat*, 134 Conn. App. 232, 38 A.3d 209 (2012), as well as the majority's attempt to distinguish the present case from *State* v. *Reid*, 123 Conn. App. 383, 1 A.3d 1204, cert. denied, 298 Conn. 929, 5 A.3d 490 (2010). Contrary to the majority, I conclude that the facts of the present case are much more closely aligned with those presented in *Reid*, and clearly distinguishable from the facts in *Kalphat*.

The majority claims that the facts of the present case more closely resemble those of *Kalphat*. Certainly, there are factual similarities between the two cases, but the majority ignores the crucial difference that distinguishes the present case from *Kalphat* for the purpose of applying *Lewis* and *Hedge*: the defendant in *Kalphat* was arrested *in his home*, and all of the evidence of the defendant's intent to sell drugs was recovered *from his home*. *State* v. *Kalphat*, supra, 134 Conn. App. 234. That single fact is sufficient to make *Kalphat* fall squarely within *Lewis* and *Hedge*. As I already have explained, the principle on which we relied in those two cases is that the state must prove that the defendant's presence at a particular location has more than a merely

coincidental connection to his possession of drugs in that location. In *State* v. *Lewis*, supra, 303 Conn. 773, one of the key facts on which we relied to conclude that the state had failed to prove more than a coincidental connection between the defendant's presence in a particular location and his possession of drugs was that he was within one block of his home when he was arrested. We focused on the fact that the defendant "necessarily" had to pass through that location in order to return home. Id. That principle applies with even greater force under the facts presented in *Kalphat*—because the defendant was in his home, the state had to provide more than mere evidence of the possession of drugs in sufficient quantity, and drug paraphernalia of the proper type, to support an inference to sell. The state had to provide proof that the defendant intended to sell the drugs from his home. In that case, however, the state produced no such evidence. *State* v. *Kalphat*, supra, 241–42.

By contrast, in the present case, the defendant was not arrested in his home. He was arrested in the apartment where he paid for the privilege of storing his drugs. The defendant did not live in Patrick's apartment, and the state produced sufficient evidence to establish that he was not merely passing through. The facts of this case more closely resemble those presented in *State* v. *Reid*, supra, 123 Conn. App. 383, at least for the purpose of applying *Lewis* and *Hedge*. In *Reid*, as in the present case, the defendant was arrested in an area known for drug trafficking, and the evidence supported the reasonable inference that the defendant's presence in that area was not coincidental. Id., 393–98. In the present case, the project, like the parking lot in *Reid*, was an area known to be a "high crime drug trafficking area" where police had made "hundreds of arrests for narcotics in the past." Additionally, contrary to the majority's incorrect characterization of Patrick's testimony, she did not testify that she only saw the defendant "on his way to or from" her apartment. She testified that she saw him on the project grounds, outside of her apartment, "around" the same times that he had been at her apartment. She never limited her testimony to a statement that she only saw the defendant coming from and going to her apartment. Her testimony regarding the defendant's presence in the project, outside her apartment, is more than broad enough to support the jury's reasonable inference that the defendant's presence in Patrick's apartment was more than merely coincidental. Those facts are sufficient to distinguish the present case from *Lewis* and *Hedge*, supporting the conclusion that the facts of the present case, like those in *Reid*, are sufficient to establish possession with intent to sell within the proscribed area.

On the basis of all of the evidence in the present case, the jury reasonably could have inferred that the defendant used Patrick's apartment as his base for sell-

ing drugs in the project. He kept all of the paraphernalia associated with the sale of narcotics, including packaging materials, cell phones, weapons, razor blades, and the narcotics themselves, in the apartment. He was carrying a significant amount of cash in mixed denominations on his person in the middle of the night. The project was known to be a high drug trafficking area. Moreover, Patrick testified that the defendant was there frequently, two to three times per week, and that she had observed the defendant outside the apartment, around the project grounds, on roughly the same days that he visited the apartment. Based on these facts, it is unreasonable to conclude that there was insufficient evidence to support the jury's determination that the state met its burden of proof as to the element of intent to sell narcotics within 1500 feet of a public housing project. In doing so, the majority seemingly substitutes its own judgment for that of the jury. See *State* v. *Brown*, 235 Conn. 502, 510, 668 A.2d 1288 (1995).

In sharp contrast to both *Lewis* and *Hedge*, the defendant in the present case was not merely passing through the project. A frequent visitor to an apartment, unlike an individual in a motor vehicle or on a bicycle, is not "in transit." Cf. *State* v. *Lewis*, supra, 303 Conn. 773. Here, the state produced evidence that the defendant kept everything he needed to sell narcotics in Patrick's apartment, and, moreover, that he paid for that privilege. As the state aptly observes, the defendant made a conscious business decision to use Patrick's apartment as his base for his drug activity. Neither the defendant nor the drugs were present in the apartment by chance—both were there by his arrangement. And there was nothing transient about his presence at the project. The state produced evidence that the defendant visited the apartment multiple times per week, and that he was observed outside the apartment around the project grounds just as frequently. In contrast to the defendants in *Lewis* and *Hedge*, here, when the defendant was at the apartment with more than $1000 on his person, he was not coincidentally passing through. The majority's conclusion implicitly requires the assumption that the jury should have drawn the unreasonable inference that the defendant, a drug dealer who stored all of his supplies within a housing project that was a high drug trafficking area, would forgo the opportunity to sell his product to readily accessible customers in the project in favor of venturing outside the project to sell his drugs elsewhere. I therefore disagree with the majority's assertion that the evidence was in equipoise. If the jury credited the state's witnesses—and we must assume that it did for purposes of this analysis—then the state produced sufficient evidence to allow the jury to find beyond a reasonable doubt that the defendant kept drugs in the apartment and that he sold drugs in the project, a neighborhood known to be a high drug trafficking area. The mere fact that the jury could have

drawn different inferences does not call into question the sufficiency of the state's evidence.

Accordingly, I respectfully dissent.

[1] The present case is also clearly distinguishable from *State* v. *Jordan*, 314 Conn. 89, 101 A.3d 179 (2014), a case cited by the majority. In *Jordan,* we concluded that the state had failed to sustain its burden to prove that the defendant intended to sell within a proscribed area on the basis that the state had presented *no* evidence to support an inference that the defendant in that case intended to sell drugs within 1500 feet of the nearby elementary school, as the state had charged. Id., 107. In fact, we observed, "the only evidence regarding the defendant's past drug sales was that they had occurred at strip clubs and other unspecified locations." Id.

——————————————